United States District Court

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JESSE J. BYRD, *et al.*,

        Plaintiffs,

        v.

SF CITY & COUNTY, *et al.*,

        Defendants.

_____/

No. C 11-01742 DMR

**ORDER ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs Jesse Byrd, Malik Britt, Rashad Conley, and Andrew Armstrong filed a civil rights action under 42 U.S.C. § 1983 claiming that they suffered constitutional violations committed by the City and County of San Francisco ("CCSF") and six police officers.[1]  The individual defendants are Officers Kelvin Sanders, Alex Rodatos, Roselo Pascua, Jonathon Catlett, Richard Soares, and Sergeant William Escobar.  Before the court is Defendants' Motion for Partial Summary Judgment. [Docket No. 72.]  The court held a hearing at which the parties were represented by counsel.  For the following reasons, the motion is GRANTED IN PART AND DENIED IN PART.

_____

[1] The complaint initially included the claims of Careem Conley, a self-represented Plaintiff. The court subsequently dismissed Mr. Conley's claims without prejudice due to his failure to prosecute. [Docket No. 58.]

**United States District Court**

For the Northern District of California

## I. BACKGROUND

This lawsuit arises out of an incident that occurred on April 12, 2009 at 1305 Bowdoin Street in San Francisco, California.[2] Escobar, along with officers from SFPD's Ingleside and Bayview police stations, deployed to the intersection of Bowdoin and Mansell Streets as part of an investigation into a shooting that had occurred in the neighborhood the previous day. (Defs.' UMF 1, 2.) The officers had information that Andre West-Walker, a suspect in the shooting, was on felony probation for weapons-related offenses, and was subject to search as a condition of his probation. (Defs.' UMF 3, 4; Jt. UMF 1, 2.) They determined that West-Walker lived at 1315 Bowdoin Street, the "target house." (Defs.' UMF 5; Jt. UMF 3.) Escobar planned to question West-Walker regarding his whereabouts on the day of the shooting. (Defs.' UMF 6.)

Escobar first assembled a team of officers and conducted a briefing on the planned operation. (Defs.' UMF 7.) He showed the officers a photograph of West-Walker, gave them the address of the target house, described the location, and instructed them to set up a perimeter in the area of Bowdoin and Mansell. (Defs.' UMF 8.) Bowdoin intersects with Mansell. Hamilton also intersects with Mansell, and runs one block east of and parallel to Bowdoin. (Defs.' Mot. 4.)

After arriving at the scene, Officers Pascua, Rodatos and Sanders took positions on Mansell, which is north of the target house. According to Defendants, from their location, the three officers could see the rear yards of houses on Bowdoin and Hamilton over a short brick wall. (Defs.' UMF 9; Jt. UMF 4; Decl. of B. Russi in Supp. of Defs.' Mot. for Summ. J., Nov. 21, 2012, Ex. B ("Sanders Dep.") 31:5-21; Decl. of R. Pascua in Supp. of Defs.' Mot. for Summ. J., Nov. 21, 2012, ¶

---

[2] The court's Standing Order requires that motions for summary judgment be accompanied by a joint statement of undisputed material facts, with citations to admissible evidence. In this case, the parties failed to file a joint statement, in violation of the court's order. Defendants filed their own statement of undisputed facts with their motion. [Docket No. 73.] Shortly before their reply brief was due, Defendants filed a draft joint statement of undisputed facts, but represented that Plaintiffs had not given permission to submit the draft because of a dispute regarding one fact. [Docket No. 89-2.] The court reviewed the submissions and determined which facts did not appear to be genuinely in dispute, and issued an order listing the facts that the court would deem undisputed, absent objection by the parties. Defendants objected to one fact; Plaintiffs did not object. Therefore, except where noted, the facts cited in this order are taken from the portions of Defendants' Statement of Undisputed Material Facts ("Defs.' UMF") and the parties' Draft Joint Statement of Undisputed Material Facts ("Jt. UMF") that the court determined were undisputed and to which no party objected.

United States District Court

For the Northern District of California

1  4; Defs.' Request for Judicial Notice, Ex. A[3] (Careem Conley Preliminary Hr'g Trans., "PH

2  Trans.") 9:25-10:5.) Escobar went to the front of 1315 Bowdoin to knock on the front door. (Decl.

3  of Russi, Ex. A ("Escobar Dep.") 50:17-24.) Almost immediately, Pascua and Sanders saw

4  individuals running in the backyard of the target house. (Sanders Dep. 36:11-37:19; Decl. of Pascua

5  ¶¶ 2, 5.) Sanders testified that he saw two people leave the backyard of 1315 Bowdoin by hopping

6  the fence behind that house. According to Sanders, one individual ran southbound, and the other ran

7  toward the officers positioned on Mansell. (Sanders Dep. 30:19-25; 36:13-37:19.) At some point,

8  Sanders reported on the police radio, "we got some guys that just came out the back." (Defs.' UMF

9  12; Jt. UMF 5.)

10      Both Sanders and Rodatos testified that they observed the individual who was running in

11  their direction climb over the fence and into the yard of 1305 Bowdoin Street, which is Plaintiff

12  Byrd's house. (Sanders Dep. 39:15-40:23; Decl. of Russi, Ex. C ("Rodatos Dep.") 43:10-19, 44:1-5;

13  45:18-46:4.) They saw the individual ascend the rear stairs that connected the yard to a deck

14  attached to the house. (Sanders Dep. 40:11-41:1; Rodatos Dep. 46:25-47:8.) Once he was on the

15  deck, Rodatos and Sanders ordered the individual, whom they later determined to be Plaintiff Britt,

16  to stop and show his hands. (Defs.' UMF 17; Jt. UMF 8.)

17      Plaintiffs have a different understanding of Britt's movements. Plaintiff Byrd lives at 1305

18  Bowdoin, which is located two houses north of 1315 Bowdoin, the target house. According to

19  Plaintiffs, Byrd was at home celebrating Easter with his family, which included his grandsons Malik

20  Britt, Careem Conley, Rashad Conley, and Andrew Armstrong, as well as his daughter Renee Byrd-

21  Davis. (Decl. of J. Byrd in Opp'n to Defs.' Mot. for Summ. J., Dec. 5, 2012, ¶ 3; Decl. of M. Britt

22

23      [3] Defendants ask the court to take judicial notice of a copy of the reporter's transcript of a
24  preliminary hearing in the case of *People v. Careem Conley*, dated August 14, 2009, on the grounds that
   Federal Rule of Evidence 201 authorizes judicial notice of the existence and authenticity of public
25  documents. (Defs.' Request for Judicial Notice 2, Ex. A.) Plaintiffs did not object. The court will take
   judicial notice of the existence of this document as a "matter[] of public record." Fed. R. Evid. 201; *see
26  also Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). Defendants Rodatos, Soares, and
   Catlett each submitted declarations in which they incorporated fully the testimony that each of them
27  gave at the preliminary hearing. (Decl. of A. Rodatos in Supp. of Defs.' Mot. for Summ. J., Nov. 19,
   2012, ¶ 9; Decl. of R. Soares in Supp. of Defs.' Mot. for Summ. J., Nov. 20, 2012, ¶ 7; Decl. of J. Catlett
28  in Supp. of Defs.' Mot. for Summ. J., Nov. 20, 2012, ¶ 7.) Plaintiffs did not object to any of the
   evidence from the hearing transcript upon which Defendants rely in support of this motion.

in Opp'n to Defs.' Mot. for Summ. J., Dec. 16, 2012, ¶ 1; Decl. of R. Conley in Opp'n to Defs.' Mot. for Summ. J., Dec. 14, 2012, ¶ 1; Decl. of A. Armstrong in Opp'n to Defs.' Mot. for Summ. J., Dec. 5, 2012, ¶ 1.)  Before Easter dinner was served, Britt decided to walk the family dog, which was in the backyard.  Britt walked from the downstairs family room through a sliding glass door and onto the back deck.  (Decl. of Britt ¶ 2.)  Britt testified that as soon as he walked onto the deck, he was confronted by five officers who were standing on the sidewalk on Mansell against the fenceline facing into his grandfather's backyard.  Sanders ordered Britt to "freeze and 'put your hands up.'" (Decl. of Britt ¶ 2; Defs.' UMF 17.)

Soon thereafter, Britt's brother, Careem Conley, came out of the house onto the rear deck. (Defs.' UMF 18; Jt. UMF 9; Decl. of Britt ¶ 4.)  The officers ordered Careem Conley to go back inside the house, but he refused.  (Defs.' UMF 19.)  Unaware of whether Britt or Careem Conley were armed, Sanders and Rodatos kept them at gunpoint.  (Defs.' UMF 20.)  Rodatos then climbed over the fences from Mansell into Byrd's backyard in order to detain Britt.  Rodatos testified that he entered the yard because he "believed Mr. Britt to have fled from the target house . . . and because [he] believed Mr. Britt could be involved in criminal conduct."  (Decl. of Rodatos ¶ 4.)

A melee ensued, the details of which are disputed.  According to Defendants, as Rodatos tried to handcuff Britt, Britt moved as if to free himself.  (Rodatos Dep. 50:13-23; Decl. of Soares ¶ 3.)  Careem Conley then punched Rodatos in the face and pushed him up against the railing of the deck.  (Rodatos Dep. 50:15-25; Sanders Dep. 47:10-16.)  Catlett and Soares, who had arrived as backup, ordered Careem Conley to stop resisting, and used force in order to control him.  (PH Trans. 41:8-16, 51-53; Rodatos Dep. 50-52, 55; Decl. of Soares ¶ 2.)  Britt was flailing his arms, one of which had a handcuff attached to it.  Soares jabbed Britt with his baton, believing that Britt could use the handcuff as a weapon.  Britt was then restrained.  (PH Trans. 52:18-53:28; Decl. of Soares ¶ 3.)

Britt and Careem Conley recount the facts differently.  According to them, although both complied with the officers' instructions to put their hands up, Rodatos came up onto the deck, shoved Britt aside, went over to Careem Conley and began hitting him with a baton.  Britt testified that at least four officers came on the deck.  Officers struck Conley with their batons and their fists,

1   even after Conley fell to the ground and assumed the fetal position.  Officers also struck Britt.

2   Rodatos eventually handcuffed Britt, then struck Britt in the face.  (Decl. of Britt ¶¶ 3-6; Decl. of

3   Russi, Ex. E ("C. Conley Dep.") 45:16-24; 49:15-19; Decl. of Russi, Ex. H ("R. Conley Dep.") 54:8-

4   12.)

5           During this altercation Rashad Conley came out of the house onto the back deck.  He is the

6   older brother of Britt and Careem Conley.  (Defs.' UMF 30; Jt. UMF 10.)  It is undisputed that the

7   officers ordered Rashad Conley to go back into the house, that he refused, and that he threw himself

8   on top of his brother Careem while officers were trying to gain control of Careem.  (Defs.' UMF 31,

9   32; Jt. UMF 11.)  Rashad Conley asserts that officers hit him with "a few [baton strikes] on his

10  back," and that he attempted to pull Careem Conley off the ground.  (R. Conley Dep. 67-68; Decl. of

11  R. Conley ¶ 4; Defs.' UMF 33; Jt. UMF 12.)  When Rashad Conley stood up, Catlett jabbed him

12  twice in the ribs with his baton.  (R. Conley Dep. 67-68.)  Catlett admits that he delivered two baton

13  jabs to Rashad Conley's ribs.  (Defs.' UMF 34; Jt. UMF 13.)  Rodatos and Soares deny having used

14  force on Rashad Conley, but admit that they used force on Careem Conley.  (Rodatos Dep. 50-55;

15  Decl. of Rodatos ¶ 7; Decl. of Soares ¶ 4; PH Trans. 51-53.)

16          After the officers restrained Britt and Careem Conley, the officers asked Renee Byrd-Davis if

17  they could take them through the house and out to the street, as there was no other way to extricate

18  them from the back deck.  (Defs.' UMF 25.)  Ms. Byrd-Davis told them that they could.  (Defs.'

19  UMF 24.)  Britt received a citation for resisting the officers.  (Defs.' UMF 49; Jt. UMF 19.)  Careem

20  Conley was booked and charged with battery, to which he ultimately pled no contest.  (Defs.' UMF

21  50.)

22          Pascua did not join the other officers on the deck of Byrd's house.  Having observed

23  individuals running in the back yard of the target house, Pascua chased one of them by running east

24  on Mansell, then south on Hamilton.  (Decl. of Pascua ¶¶ 2, 5; Defs.' UMF 13; Jt. UMF 7.)  He

25  recalls calling a "code 33" over the radio to clear the channel and request backup.  He provided a

26  description of the suspect he was chasing, who he later lost.  (Defs.' UMF 14.)  Pascua did not go

27  over the fence into the backyard of 1305 Bowdoin, nor did he detain or use force on any Plaintiff.

28  (Defs.' UMF 29.)

United States District Court

For the Northern District of California

At some point, Armstrong exited his grandfather's house through the front door in order to find out what was going on with the police officers outside. (Decl. of Armstrong ¶ 2.) By this time, Escobar, who was at the front of 1315 Bowdoin, had learned over the radio that officers were chasing someone in the backyards and that officers had requested backup. (Defs.' UMF 40.) He had also heard over the radio that there was a struggle going on and that someone was resisting. (Defs.' UMF 41.) He heard sirens and knew other officers were arriving in response to the calls for backup. (Defs.' UMF 42.) He knew that the backyards of the houses on Bowdoin were connected. (Defs.' UMF 44.) Escobar saw Armstrong leave the front door of 1305 Bowdoin and jog toward the intersection of Bowdoin and Mansell. Armstrong admitted that when he left the house, he was moving at a slight jog. (Defs.' UMF 43; Jt. UMF 16.)

Officer Miguel Gonzales (not a defendant) arrived in his patrol car, and Escobar directed him to detain Armstrong. (Defs.' UMF 45; Jt. UMF 17.) Escobar did not know whether Armstrong had a weapon. (Defs.' UMF 47.) Gonzales and Escobar put Armstrong in handcuffs. (Defs.' UMF 46; Jt. UMF 18.) Armstrong testified that an officer pointed a gun at him, told him to get on the ground, and then handcuffed him and moved him to the corner. (Decl. of Russi, Ex. I ("Armstrong Dep.") 32:24-33:11; 40:14-19; 43:1-12.) After speaking to other officers who had been involved in the events in the backyards, Escobar determined that Armstrong had not been involved. He then directed Gonzales to issue Armstrong a release form and to uncuff him. (Defs.' UMF 48.) According to Armstrong, he waited with two officers for about an hour before he was released. (Armstrong Dep. 40:16-19; Decl. of Armstrong ¶ 3.)

In their Second Amended Complaint, Plaintiffs assert 42 U.S.C. § 1983 claims against Defendants for violation of their Fourth Amendment rights to be free from unreasonable searches and seizures. In addition, Plaintiffs assert a Section 1983 claim against Defendant City and County of San Francisco under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and a 42 U.S.C. § 1981 equal protection claim against all Defendants.

Defendants now move for summary judgment on the following claims: 1) Britt's unlawful detention claim against Rodatos, Sanders, Catlett, Soares, and Pascua; 2) Britt's excessive force claim against Sanders and Rodatos, arising out of the display of firearms, and against Catlett and

1    Pascua; 3) Conley's unlawful detention claim against Rodatos, Catlett, and Soares; 4) Conley's

2    excessive force claim against Rodatos, Soares, Catlett, and Pascua; 5) Armstrong's unlawful

3    detention claim against Escobar; 6) Byrd's unlawful entry claim against Rodatos, Catlett, Soares,

4    and Pascua; 7) Plaintiffs' *Monell* claims against the City and County of San Francisco; and 8)

5    Plaintiffs' equal protection claim.[4]  (Defs.' Mot. 2-3.)

6                                    **II.  LEGAL STANDARDS**

7            A court shall grant summary judgment "if . . . there is no genuine dispute as to any material

8    fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of

9    establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*

10   *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light

11   most favorable to the non-movant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)

12   (citation omitted).  A genuine factual issue exists if, taking into account the burdens of production

13   and proof that would be required at trial, sufficient evidence favors the non-movant such that a

14   reasonable jury could return a verdict in that party's favor.  *Id.* at 248.  The court may not weigh the

15   evidence, assess the credibility of witnesses, or resolve issues of fact.  *See id.* at 249.

16           To defeat summary judgment once the moving party has met its burden, the nonmoving party

17   may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit

18   or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine

19   issue of material fact exists.  *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630

20   (9th Cir. 1987).  In other words, there must exist more than "a scintilla of evidence" to support the

21   non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice.  *See*

22   *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Similarly, "[w]hen opposing

23   parties tell two different stories, one of which is blatantly contradicted by the record, so that no

24   reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on

25   the motion.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

26   _____

27           [4] Defendants do not move for summary judgment on two claims: 1) Britt's excessive force
     claims against Rodatos and Soares; and 2) Britt's unlawful arrest claim against Rodatos.  (Defs.' Mot.
28   2.)

### III.  ANALYSIS

A plaintiff asserting a claim under Section 1983 must demonstrate that the action (1) occurred "under color of state law," and (2) resulted in the deprivation of a constitutional or federal statutory right.  *Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988) (citations omitted).  The parties dispute whether Defendants violated Plaintiffs' Fourth Amendment rights and whether certain Defendants are entitled to qualified immunity.  Defendants, as the moving party, bear the initial burden on summary judgment of pointing out "an absence of evidence to support [Plaintiffs'] case."  *Celotex*, 477 U.S. at 325.  Defendants also bear the burden of proving that they are entitled to qualified immunity.  *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005).

The court will analyze each Plaintiff's claims at issue in this motion.

### A.      Plaintiff Malik Britt

#### 1.      Unlawful Detention Claim Against Sanders and Rodatos

Defendants move for summary judgment on Britt's unlawful detention claim against Sanders and Rodatos on the ground that both officers are entitled to qualified immunity.  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The analysis involves two inquiries.  First, taken in the light most favorable to plaintiff, the court must ask whether the facts alleged show that the officer's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the answer is "no," then the court need not inquire further before ruling that the officer is entitled to qualified immunity.  *Id*.  If, however,  "a violation could be made out on a favorable view of the parties' submissions,"  the court must examine "whether the [constitutional] right was clearly established."[5]  *Id*.  "The relevant, *dispositive inquiry* in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (emphasis

---

[5] In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court held that a court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

1   added) (internal quotation marks omitted) (citing *Saucier*, 533 U.S. at 202).  If the law did not put

2   the officer on notice that his conduct would be clearly unlawful, summary judgment based on

3   qualified immunity is appropriate.  *Saucier*, 533 U.S. at 202.

4        The Ninth Circuit has made clear that "when [qualified immunity] depends on genuinely

5   disputed issues of material fact, the court must submit the fact-related issues to the jury."  *Ortega v.*

6   *O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998); *see also Torres v. City of Los Angeles*, 548 F.3d

7   1197, 1210-11 (9th Cir. 2008) (noting that where "historical facts material to the qualified immunity

8   determination are in dispute," a jury must decide those facts).  "The determination of whether a

9   reasonable officer could have believed his conduct was lawful is a determination of law that can be

10  decided on summary judgment only if the material facts are undisputed."  *LaLonde v. Cnty. of*

11  *Riverside*, 204 F.3d 947, 953 (citing *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)).

12       Here, Defendants argue that Sanders and Rodatos are entitled to qualified immunity because

13  it was not unreasonable for them to detain Britt in order to investigate whether he was involved with

14  the individuals seen running out of the backyard of the target house, with one individual seen

15  jumping over the fence into the backyard of 1305 Bowdoin.  Plaintiffs counter that the existence of a

16  genuine dispute of material fact renders judgment as a matter of law improper.  Plaintiffs also argue

17  that the officers are not entitled to qualified immunity because the doctrine is not available to those

18  who knowingly violate the law.

19       With respect to the detention, "[t]he Fourth Amendment prohibits 'unreasonable searches

20  and seizures' by the Government, and its protections extend to brief investigatory stops of persons or

21  vehicles that fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002)

22  (citing *Terry v. Ohio*, 392 U.S. 1, 9  (1968)).  "*Terry* created a limited exception to th[e] general

23  rule" that police detentions require probable cause, wherein "certain seizures are justifiable under

24  the Fourth Amendment if there is articulable suspicion that a person has committed or is about to

25  commit a crime."  *Florida v. Royer*, 460 U.S. 491, 498 (1983).

26       An investigatory stop is reasonable under the Fourth Amendment if "the officer's action was

27  justified at its inception" and the investigation "was reasonably related in scope to the circumstances

28  which justified the interference in the first place."  *United States v. Sharpe*, 470 U.S. 675, 682

United States District Court

For the Northern District of California

1   (1985) (quoting *Terry*, 392 U.S. at 20).  An officer's action is justified at its inception if the officer

2   had "reasonable suspicion" of criminal activity before initiating an investigatory stop.  *United States*

3   *v. Sokolow*, 490 U.S. 1, 7 (1989).  Reasonable suspicion means the officer must be able to identify

4   "specific and articulable facts which, taken together with rational inferences from those facts,

5   reasonably warrant that intrusion."  *Terry*, 392 U.S. at 21; *see also United States v. Cortez*, 449 U.S.

6   411, 417 (1981) (holding that "the totality of the circumstances – the whole picture – must be taken

7   into account" when determining if an officer had reasonable suspicion to perform an investigatory

8   stop).  The reasonable suspicion standard "'is a less demanding standard than probable cause,' and

9   merely requires 'a minimal level of objective justification.'"  *Gallegos v. City of Los Angeles*, 308

10   F.3d 987, 990 (9th Cir. 2002) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  When

11   detaining a person under *Terry*, a police officer is entitled to conduct a limited investigation to

12   determine if the person was involved in criminal activity.  *See United States v. Hensley*, 469 U.S.

13   221, 229 (1985); *Royer*, 460 U.S. at 498; *Terry*, 392 U.S. at 30.  The investigation can be no more

14   intrusive than necessary to either dispel or confirm the officer's suspicion.  *See Royer*, 460 U.S. at

15   499-500.

16        As noted, Plaintiffs argue that there is a genuine dispute of material fact.  Rodatos and

17   Sanders both testified that they observed Britt run toward them from the direction of the back of the

18   target house, then jump over the back fence into 1305 Bowdoin, which led them to confront and

19   detain him.  But Britt flatly contradicts this, testifying that he walked out of the 1305 Bowdoin house

20   onto the back deck intending to walk the family dog, when officers accosted him.[6]

21        In response, Defendants argue that there is undisputed evidence that the officers saw

22   individuals running in the area behind the target house, and that one had jumped over the fence into

23   the backyard of 1305 Bowdoin.  (Defs.' Reply 6.)  Therefore, Defendants maintain that even

24   assuming the truth of Britt's version of events – that he merely walked out the back of his

25

26        [6] Plaintiffs also point to the testimony of another officer, Jeffrey Chang (who is not a defendant),

27   to support their argument that there is a dispute of material fact about what Sanders and Rodatos saw. Chang, who was maintaining the southern perimeter of the block, testified that he did not see anyone running in the backyards.  (Decl. of Russi, Ex. S ("Chang Dep.") 41:8-42:10.)  However, there is no

28   evidence that Chang was able to see into the backyards on Bowdoin at the same time Sanders, Rodatos, and Pascua were watching the backyards.

1  grandfather's house onto the back deck – it was not unreasonable for Sanders and Rodatos to detain

2  Britt for investigation.

3        The court finds that a key disputed fact precludes entry of summary judgment.  Sanders did

4  not testify that he observed unidentified "individuals" running and jumping over fences; he testified

5  that he saw *Britt* come out of the target house, climb over fences into the yard of 1305 Bowdoin and

6  ascend a set of stairs to the back deck.  Similarly, Rodatos testified that he saw *Britt* climb over a

7  fence into the yard of 1305 Bowdoin and go onto the deck.  This testimony is in direct conflict with

8  Britt's statement.  Viewing the evidence in the light most favorable to Plaintiffs, it is possible for a

9  reasonable juror to conclude that Sanders and Rodatos' version of events is not believable, and that

10 they entered Byrd's yard and detained Britt without a reasonable suspicion of criminal activity.

11 Accordingly, Defendants are not entitled to summary judgment on Britt's unlawful detention claim

12 against Sanders and Rodatos.

13               **2.      Unlawful Detention Claim Against Catlett and Soares**

14       Defendants argue that summary judgment is appropriate on Britt's unlawful detention claim

15 against Catlett and Soares because there is no evidence that either officer detained Britt.

16 Alternatively, Defendants contend that even if they detained Britt, it was based on information

17 provided to them over the police radio or by other officers, and it was reasonable for them to rely on

18 such information.

19       Plaintiffs assert that Catlett and Soares can be held liable on an "integral participation"

20 theory of liability, and that a jury properly could hold both officers responsible for unlawfully

21 detaining Britt, even if Britt could not specifically identify them.  Plaintiffs point to circumstantial

22 evidence; both officers were present at the scene of the altercation on the deck, and both officers

23 admitted to using force at the scene, with Soares admitting use of force on Britt.

24       An officer may be liable for conduct where there has been "integral participation . . . in the

25 alleged constitutional violation."  *Torres*, 548 F.3d at 1206 (citing *Chuman v. Wright*, 76 F.3d 292,

26 294-95 (9th Cir. 1996)).  "'[I]ntegral participation' does not require that each officer's actions

27 themselves rise to the level of a constitutional violation."  *Boyd v. Benton Cnty.*, 374 F.3d 773, 780

28 (9th Cir. 2004).  However, it does require "some fundamental involvement in the conduct that

United States District Court

For the Northern District of California

1  allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir.

2  2007).  A person deprives another of a constitutional right within the meaning of Section 1983 if he

3  does an affirmative act, participates in another's affirmative acts or omits to perform an act which he

4  is legally required to do, that causes the deprivation of which the plaintiff complains.  *Leer*, 844 F.2d

5  at 633.  "The inquiry into causation must be individualized and focus on the duties and

6  responsibilities of each individual defendant whose acts or omissions are alleged to have caused a

7  constitutional deprivation."  *Id.* (citations omitted).  The Ninth Circuit has rejected the "team effort"

8  standard that allows a jury to consider defendants' conduct together; the proper measure is "to base

9  each individual's liability on his own conduct."  *Hopkins v. Bonvicino*, 573 F.3d 752, 769-70 (9th

10 Cir. 2009) (holding that "integral participation" requires "more participation" than where officer

11 interviewed a witness, did not participate in the unconstitutional search, and had conversations with

12 officers who did conduct the search) (citing *Chuman*)).

13     Plaintiffs did not cite any case holding an officer responsible under an integral participation

14 theory where another officer unlawfully detained an individual.  However, such a claim may be

15 pursued under Ninth Circuit precedent.  In *Liston v. County of Riverside*, 120 F.3d 965, 981 (9th Cir.

16 1997), the court held that all of the defendant officers who had admitted to being inside the

17 plaintiffs' premises during the execution of a search warrant "were participants in the detention of

18 the [plaintiffs]," not just those officers who used force to handcuff one of the plaintiffs.  120 F.3d at

19 981 (noting that a "seizure occurs where the officer 'by means of physical force or show of

20 authority, has in some way restrained the liberty of a citizen.'" (quoting *United States v. Kerr*, 817

21 F.2d 1384, 1386 (9th Cir. 1987))).  Accordingly, as the court concluded that there was sufficient

22 evidence of the existence of a genuine issue of fact regarding the reasonableness of the plaintiffs'

23 detention, the defendant officers "who by their presence in the home assisted in restraining them"

24 during the search were not entitled to summary judgment on the plaintiffs' Fourth Amendment

25 claims.  *Liston*, 120 F.3d at 981; *see also Keane v. McMullen*, __F. Supp. 2d__, No. C 07-4894

26 SBA, 2012 WL 3309698, at *10 (N.D. Cal. Aug. 13, 2012) (citing *Liston* and holding that plaintiffs

27 had presented evidence sufficient to create triable issue of material fact as to whether officer was

28

United States District Court

For the Northern District of California

integral participant in alleged use of excessive force where he guarded perimeter of plaintiffs' residence to prevent any escapes during execution of search warrant).

It is undisputed that Catlett and Soares were present on the rear deck of 1305 Bowdoin, having arrived in response to a radio call for backup.  Defendants did not specifically cite to any evidence regarding when Catlett and Soares arrived in the backyard and what they observed when they arrived.  However, both officers testified at Careem Conley's preliminary hearing and incorporated their testimony into the declarations they submitted in support of this motion.[7]  Catlett testified as follows: he responded to the area of Mansell and Bowdoin after hearing a code 33 on the radio as well as a request for backup.  He learned that two suspects had fled a residence and that officers were trying to detain them.  When he arrived at Mansell, he saw officers on the street holding two individuals who were standing on a deck, including Careem Conley, at gunpoint.[8]  (PH Trans. 64.)  He took his position with the other officers while Sanders was talking with the two individuals.  Catlett then saw Rodatos and two other officers, including Soares, climb fences to get to the backyard of 1305 Bowdoin and climb up to the deck; he holstered his weapon due to the presence of the officers on the deck.  (PH Trans. 66-67.)  Catlett testified that as soon as he saw Rodatos try to handcuff the unidentified person, that person "began to resist by turning away and moving in different directions."  (PH Trans. 68:3-5.)  Catlett then began to jump fences to enter the yard because "[he] figured they could use some more help over there."  (PH Trans. 68:11-12.)  He saw Careem Conley "[run] straight at the officer and almost push[] him off the balcony."  (PH Trans. 68:12-16.)  He then "saw them in a melee," and concentrated on getting over the fence to where the altercation was taking place.  (PH Trans. 68:16-18.)  After he reached the deck, he "began to try to

---

[7] Plaintiffs did not object to any portion of the preliminary hearing transcript.  It appears that Plaintiffs did not depose Catlett or Soares.

[8] Catlett was unable to identify the other person being held at gunpoint on the deck.  (PH Trans. 65.)

13

United States District Court

For the Northern District of California

1    detain Careem [Conley]." (PH Trans. 70:7-8.) Catlett denies having used any force on Britt, but

2    admits that he used force on Careem Conley and Rashad Conley, who were on the deck with Britt.[9]

3         Soares testified that he too responded to a code 33 on the radio, and heard that "some

4    suspects were running out the back." (PH Trans. 45:26-46:1.) He testified that when he initially

5    responded he did not know why the officers were holding the two at gunpoint, but that someone may

6    have later mentioned a gun. (PH Trans. 61:23-62:5.) When he arrived, he saw officers on Mansell

7    with guns drawn, pointed at Careem Conley and Britt, both of whom were on a deck. (PH Trans.

8    46.) Soares testified that he then "approached the backyard to try and make contact to further detain

9    them." Soares, Rodatos, and two other officers then climbed two fences and up onto the deck where

10   Careem Conley and Britt were standing. (PH Trans. 48:2-13.) According to Soares, Rodatos tried

11   to handcuff Britt; Britt started to move, and then Careem Conley pushed Soares to the side to rush at

12   Britt and Rodatos. (PH Trans. 50:1-51:5.) Soares then saw Careem Conley hit Rodatos in the face.

13   (PH Trans. 51:24-52:1.) Soares began striking Careem Conley with his baton, more officers came

14   onto the deck and "a big pushing match started." (PH Trans. 52:3-17.) It is undisputed that Soares

15   used force on Britt; he admits that he saw Britt struggling with an officer who was trying to handcuff

16   him and that he struck Britt with his baton after ordering him to stop resisting. (Decl. of Soares ¶ 3.)

17        The court concludes that there is sufficient evidence to create a triable issue of material fact

18   as to whether Soares and Catlett were integral participants in Britt's alleged unlawful detention.

19   With respect to Soares, he admits that he used force on Britt to assist the officer with whom Britt

20   was struggling. A jury could reasonably conclude that the use of force to assist another officer in

21   gaining control of Britt was participation in Britt's detention. *See Blankenhorn*, 485 F.3d at 481

22   n.12 (reversing summary judgment for officer who helped handcuff plaintiff, stating officer's help

23   handcuffing "was, of course, meaningful participation" in arrest which resulted in use of restraints

24   challenged under the Fourth Amendment). Whether there is a triable issue of material fact regarding

25   Catlett's participation in Britt's detention is a closer question, given that there is no evidence that

26

27        [9] Catlett's proximity on the deck to Britt is unclear; the only evidence in the record about the size
     of the deck was Soares' testimony at the preliminary hearing. He answered in the affirmative when
28   asked whether the deck was "relatively small." (PH Trans. 50:22-23.)

**United States District Court**

For the Northern District of California

1   Catlett had any physical contact with Britt during the altercation.  However, Catlett's presence on

2   the back deck, along with his admission that he used force on Rashad Conley, establishes that he

3   was in some proximity to Britt during the events on the deck.  Based on this evidence, the court

4   concludes that a jury could reasonably determine that Catlett, "who by [his] presence [on the deck]

5   assisted in restraining" Britt, thus was a participant in Britt's detention.  *See Liston*, 120 F.3d at 981.

6        Defendants argue that even if Catlett and Soares detained Britt, the detention was based on

7   information provided to them over the police radio or by other officers, and that it was reasonable

8   for them to rely on such information.

9        "[L]aw enforcement officers are generally entitled to rely on information obtained from

10   fellow law enforcement officers."  *Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005) (en banc)

11   (citing *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971)).  "An officer is not

12   liable for acting on information supplied by another officer, even if that information later turns out to

13   be wrong, if he has an objectively reasonable, good-faith belief that he is acting pursuant to proper

14   authority."  *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 535 (9th Cir. 2010) (citing

15   *Motley*, 432 F.3d at 1081-82).  However, "all officers . . . have an ongoing duty to make appropriate

16   inquiries regarding the facts received or to further investigate if insufficient details are relayed."

17   *Motley*, 432 F.3d at 1081 (citing *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1293

18   n.16 (9th Cir. 1999)).  "The lynchpin is whether the officer's reliance on the information was

19   objectively reasonable."  *Id.* at 1082.

20        The facts regarding the information known to Catlett and Soares are limited.  Catlett testified

21   that he was informed that two suspects had fled a residence and that officers were trying to detain

22   them, and that when he arrived at the scene, he witnessed two officers holding Careem Conley and

23   another individual at gunpoint.  He testified that once he saw Britt attempt to resist handcuffing, he

24   made his way towards the backyard to offer assistance.  Soares testified that he heard that some

25   suspects were running and that when he initially responded, he did not know why the officers were

26   holding Britt and Careem Conley at gunpoint.  He testified that someone later may have mentioned a

27   gun, but his testimony is unclear as to when he heard this.  Soares then accompanied Rodatos into

28   the backyard to detain Britt and Careem Conley.

1    Assuming for the purposes of argument that Catlett and Soares participated in Britt's

2  detention, the court concludes that there are triable issue of material facts as to whether each officer

3  acted reasonably in relying on information they learned over the radio or from other officers in

4  detaining Britt.  It is undisputed that Catlett was told that two suspects had fled and that officers

5  were trying to detain them, and that he then witnessed two individuals being held at gunpoint.

6  However, the facts about what he saw next are in dispute.  He testified that he began to jump fences

7  to reach the deck as soon as he saw one of the individuals try to resist an officer.  However, Britt

8  testified that he complied with all of the officers' directions to him.  (Decl. of Britt ¶¶ 2, 3, 5.)  Britt

9  also testified that as Rodatos climbed the stairs onto the deck, he ordered Britt to come closer with

10  his hands up, and that Britt complied, but that Rodatos then grabbed his hand and shoved him.

11  (Decl. of Britt ¶¶ 5, 6.)  Viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have

12  established a dispute of fact as to whether Britt resisted Rodatos.  Catlett also testified that before he

13  reached the backyard of 1305 Bowdoin, he saw the officers and the two individuals in what he

14  described as "a melee" and a "fight."  (PH Trans. 68:16-22.)  However, whether Britt and Careem

15  Conley were resisting and fighting with the officers or whether the officers were using force on them

16  without provocation is also disputed.  Britt testified that during the entire encounter with the

17  officers, he never hit an officer, and Careem Conley testified that the only resistance he offered was

18  pulling his arm away from Rodatos after Rodatos grabbed him.  (Decl. of Britt ¶ 6; C. Conley Dep.

19  50; 62:3-7.)  Therefore, there are material factual questions as to what Catlett witnessed prior to

20  Britt's detention that would have formed the basis for Catlett's subsequent actions.  These questions

21  preclude a finding that Catlett's reliance on information he learned before participating in Britt's

22  detention was objectively reasonable in light of all of the circumstances.

23    With respect to Soares, he was part of the first wave of officers that entered the yard of 1305

24  Bowdoin to detain Britt.  Although he testified that he heard that some suspects were running, he did

25  not testify that he believed that Britt and Careem Conley were connected in some way with those

26  suspects.  Instead, he testified that he did not initially know why Britt and Careem Conley were

27  being held at gunpoint, and Defendants have presented no evidence about whether or when Soares

28  *ever* learned why officers were holding them at gunpoint.  Given the limited information about what

1    information Soares saw, knew or relied upon at the time of Britt's detention, the court cannot say as

2    a matter of law that his reliance on the information provided by other officers was objectively

3    reasonable.  Therefore, summary judgment on Britt's unlawful detention claims against Catlett and

4    Soares is denied.

5                  **3.        Excessive Force Claim Against Sanders and Rodatos**

6           Defendants seek summary judgment on Britt's excessive force claim against Sanders and

7    Rodatos based on their display of firearms.  Defendants argue that, just as it was reasonable for

8    Sanders and Rodatos to detain Britt for investigation into whether he was involved with the

9    individuals seen running from the back of the target house, with one climbing into Byrd's backyard,

10   it was reasonable for them to hold Britt at gunpoint because they did not know whether he was

11   armed.

12          A claim of excessive force in the context of an arrest or investigatory stop implicates the

13   Fourth Amendment right to be free from "unreasonable . . . seizures."  U.S. Const. amend. IV; *see*

14   *Graham v. Connor*, 490 U.S. 386, 394 (1989).  "Determining whether the force used to effect a

15   particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the

16   nature and quality of the intrusion on the individual's Fourth Amendment interests against the

17   countervailing governmental interests at stake."  *Id*. at 396 (citations and internal quotation marks

18   omitted).  Because the reasonableness standard is not capable of precise definition or mechanical

19   application, "its proper application requires careful attention to the facts and circumstances of each

20   particular case, including the severity of the crime at issue, whether the suspect poses an immediate

21   threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting

22   to evade arrest by flight."  *Id*.  The "most important single element" is whether there is an immediate

23   threat to safety.  *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew*

24   *v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)).  Courts also consider the "'quantum of force' used to

25   arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and

26   the plaintiff's mental and emotional state."  *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010)

27   (internal citations omitted).

28

United States District Court
For the Northern District of California

The reasonableness inquiry in excessive force cases is an objective one: whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation and without the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston*, 120 F.3d at 976 n.10. "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted). "[T]he pointing of a gun at someone may constitute excessive force, even if it does not cause physical injury." *Espinosa*, 598 F.3d at 544 (citation omitted); *see also Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014-1015 (9th Cir. 2002) (en banc).

As with Britt's unlawful detention claim, key disputed facts preclude summary judgment on his excessive force claim against Sanders and Rodatos for displaying firearms. Whether Sanders and Rodatos saw Britt run from the area of the target house and climb over fences into the backyard and onto the deck of 1305 Bowdoin is hotly disputed by Britt. If the jury believes Sanders and Rodatos, they may conclude that the officers acted reasonably in pointing their guns at Britt. If the jury believes Britt instead of the officers, the jury may reach the opposite conclusion. Accordingly, summary judgment on Britt's excessive force claim against Sanders and Rodatos based on holding Britt at gunpoint is denied.[10]

### 4.   Excessive Force Claim Against Catlett

Defendants seek summary judgment on Britt's excessive force claim against Catlett on the grounds that there is no evidence that Catlett used force on Britt. Plaintiffs assert that Catlett is liable under an integral participation theory, arguing that Catlett's presence on the back deck

---

[10] In their reply brief, Defendants argue for the first time that Sanders and Rodatos are entitled to qualified immunity on this claim. (*Compare* Defs.' Mot 15-16 *with* Defs.' Reply 6.) The court is not required to consider arguments raised for the first time in a reply brief, but even if it did here, summary judgment on the grounds of qualified immunity would be inappropriate given the dispute of fact regarding Britt's actions. *See Torres*, 548 F.3d at 1210.

1   constitutes sufficient evidence for a jury to decide that he participated in the unlawful use of force,

2   even if Britt could not specifically identify him.

3       Plaintiffs cite *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1448 (9th Cir. 1986).  In

4   *Rutherford*, the plaintiff could not say whether two particular officers punched or kicked him, but

5   testified that they were among those officers immediately surrounding him when he was being

6   beaten.  The officers conceded that they were among the officers who detained and arrested plaintiff,

7   but denied beating him.  The court reversed a directed verdict and remanded the case with respect to

8   those officers, holding that "[f]rom this evidence, a jury could reasonably infer that the named

9   officers were participants in punching or kicking Rutherford."  *Rutherford*, 780 F.2d at 1448.

10      It is undisputed that Catlett was on the back deck during the altercation.  Although Catlett

11  denied using force on Britt, he admitted that he used his baton on Rashad Conley.  Britt testified that

12  when officers, including Rodatos, got on the back deck, Rodatos shoved Britt out of the way, and

13  Britt then put his hands on top of his head to protect himself because he saw officers swinging their

14  batons.  (Decl. of Britt ¶ 6.)  He testified that he was hit on his back, stomach, and wrist, and that the

15  officer who hit him in the stomach was a different person than the officer who hit him in the back.

16  (Decl. of Britt ¶ 6.)  During this time, Britt states that there were at least four officers on the deck.

17  (Decl. of Britt ¶ 6.)  These facts are similar to the circumstances in *Rutherford*, where, like Britt, the

18  plaintiff was unable to state with certainty whether the officers present participated in beating him,

19  but could place the officers near him during the beating.  As Defendants state in their motion, "[t]he

20  melee between Careem Conley, Britt, and officers has been described as a mess, a pushing match,

21  and commotion."  (Defs.' Mot. 6.)  Viewing the facts in the light most favorable to Plaintiffs, the

22  court concludes that the evidence is sufficient to create a triable issue of fact as to whether Catlett

23  was an integral participant in the alleged use of excessive force on Britt.  Accordingly, summary

24  judgment on Britt's excessive force claim against Catlett is denied.

25           **5.       Unlawful Detention and Excessive Force Claims Against Pascua**

26      Defendants move for summary judgment on Britt's unlawful detention and excessive force

27  claims against Pascua on the grounds that there is no evidence that he detained or used force on

28  Britt.  Plaintiffs argue that Pascua is liable on an integral participation theory, and that his "false

United States District Court

For the Northern District of California

1   statements set in motion a series of events" that caused the alleged constitutional violations.  (Pls.'

2   Opp'n 14.)

3          As noted, liability pursuant to an integral participation theory requires "some fundamental

4   involvement in the conduct that allegedly caused the violation."  *Blankenhorn*, 485 F.3d at 481 n.12.

5   In this case, there is no evidence that Pascua entered the backyard of 1305 Bowdoin, pointed a gun

6   at Britt or at anyone else, or used force on any of the Plaintiffs.  There is no evidence that Pascua

7   was even present during the alleged violations, let alone that he personally participated in them.

8   Plaintiffs also argue that Pascua participated by making false statements that set the events at issue

9   into motion.  However, the undisputed evidence is that Pascua provided a description of the suspect

10  he was chasing southbound (that is, away from 1305 Bowdoin), and then reported that he lost the

11  suspect on the police radio.  He may have also called a code 33 on the radio, requesting others to

12  clear the communication channel.  Plaintiffs have not presented any evidence regarding the falsity of

13  these statements.  Accordingly, summary judgment is granted as to Britt's unlawful detention and

14  excessive force claims against Pascua.

15      **B.**      **Plaintiff Jesse Byrd**

16              **1.**      **Unlawful Entry Claim Against Rodatos, Soares, and Catlett Based Upon
                the Officers' Entry Into Byrd's Backyard**

17

18          Defendants argue that they are entitled to summary judgment on Byrd's claim against

19  Rodatos, Soares and Catlett that they unlawfully entered his backyard and deck because exigent

20  circumstances justified their entry.  Therefore, Defendants argue, the officers are entitled to qualified

21  immunity on this claim.  Plaintiffs argue that summary judgment is inappropriate because of

22  material disputed facts regarding the existence of exigent circumstances, i.e., whether Britt arrived

23  on the deck after fleeing from the target house and climbing over fences into the backyard of 1305

24  Bowdoin, or whether he arrived there by walking out of his grandfather's house.

25          The Fourth Amendment generally prohibits warrantless entry of a person's home, whether to

26  make an arrest or to conduct a search, unless an exception to the warrant requirement, such as

27  consent, emergency, or exigency, applies.  *Espinosa*, 598 F.3d at 533.  Exceptions are "narrow and

28  their boundaries are rigorously guarded to prevent any expansion that would unduly interfere with

1   the sanctity of the home." *Hopkins*, 573 F.3d at 763 (citation and internal quotation marks omitted).

2   The exigency exception "derive[s] from the police officers' investigatory function; it allows them to

3   enter a home without a warrant if they have both probable cause to believe that a crime has been or

4   is being committed and a reasonable belief that their entry is necessary to prevent the destruction of

5   relevant evidence, the escape of the suspect, or some other consequence improperly frustrating

6   legitimate law enforcement efforts." *Id.* (internal quotation and alteration marks omitted).  The

7   Supreme Court recently reiterated that "reasonableness 'must be judged from the perspective of a

8   reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and that '[t]he

9   calculus of reasonableness must embody allowance for the fact that police officers are often forced

10  to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving.'"

11  *Ryburn v. Huff*, 132 S. Ct. 987, 992 (2012) (per curiam) (alteration in original) (quoting *Graham*,

12  490 U.S. 386, 396-97.)

13          Before reaching the question of whether exigent circumstances justified the officers' entry

14  into Byrd's backyard and deck, the court must consider whether the Fourth Amendment extends

15  beyond Byrd's home to protect those spaces against warrantless entry.  The Fourth Amendment's

16  protection against warrantless searches extends to the "curtilage" around one's home.  *United States*

17  *v. Johnson*, 256 F.3d 895, 901 (9th Cir. 2001) (en banc).  When determining whether an area is part

18  of the curtilage of a home, the primary focus is "whether the area in question harbors those intimate

19  activities associated with domestic life and the privacies of the home."  *United States v. Calabrese*,

20  825 F.2d 1342, 1350 (9th Cir. 1987) (quoting *United States v. Dunn*, 480 U.S. 294, 301 n.4 (1987)).

21  The Supreme Court has set forth four factors to aid in this determination: (1) "the proximity of the

22  area claimed to be curtilage to the home"; (2) "whether the area is included in an enclosure

23  surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken

24  by the resident to protect the area from observation by people passing by."  *Johnson*, 256 F.3d at 901

25  (citing *Dunn*, 480 U.S. at 301).  These factors are not to be mechanically applied.  Instead, they are

26  analytical tools used to determine whether an area should be afforded protection from

27  unconstitutional searches.  *Id.*

28

Here, Plaintiffs assert that Byrd's back deck and backyard are part of the curtilage of his home, but did not cite any evidence to support this.  (*See* Pls.' Opp'n 9.)  Defendants argue that Plaintiffs have not pointed to evidence establishing this, but do not appear to argue that the back deck and backyard *are not* part of the curtilage.  (*See* Defs.' Reply 10.)  Based on the sparse factual record currently before the court on this issue, and drawing inferences in Plaintiffs' favor, the court determines that a fact finder reasonably could conclude that the back deck and backyard form part of the curtilage of Byrd's home.  Byrd's back deck is immediately adjacent to the home, because it is undisputed that Careem and Rashad Conley came out of the house directly onto the back deck.  The backyard appears to be immediately adjacent to the back deck, because the officers climbed the fence into the backyard and were able to climb up onto the deck from the yard.  It appears undisputed that Byrd's backyard is surrounded by a fence, creating an enclosure that includes the home.

The court also concludes that there is a genuine dispute of material fact as to whether exigent circumstances justified Rodatos' entrance into Byrd's backyard and onto his back deck.  As previously stated, if a reasonable jury believes Britt's version of events rather than that of Rodatos and Sanders, such a finding would effectively eliminate the reasonable suspicion required to permit the officers lawfully to enter Byrd's backyard to detain Britt.

With respect to Soares and Catlett, Defendants argued at the hearing that it is undisputed that they responded to a radio call for backup, and that it was reasonable for them to rely on what they were told by other officers in deciding to enter the backyard and go onto the back deck.  However, Defendants have presented no evidence about what, if anything, Soares was told by other officers.  As discussed above, there is no evidence before the court that Soares witnessed any criminal activity by Britt or that he understood why officers were holding Britt at gunpoint prior to Soares entering the backyard.  Regarding Catlett, his reasons for entering the backyard are based upon disputed facts about whether Britt resisted being handcuffed or complied with the officers' commands, as well as whether he saw Britt and Careem Conley resisting or fighting with officers.  Therefore, summary judgment as to Byrd's claims against Rodatos, Soares, and Catlett that they unlawfully entered his backyard and deck is denied.

United States District Court

For the Northern District of California

### 3.   Unlawful Entry Claim Against Rodatos, Soares, and Catlett Based Upon the Officers' Entry Into His Home

Next, Defendants seek summary judgment on Byrd's unlawful entry claim premised on Rodatos, Catlett, and Soares's entering his home to transport Britt and Careem Conley through the house to the street.  Defendants contend that entry into Byrd's home was proper, because Renee Byrd-Davis consented to the officers' entry and because there was no other way for the officers to extricate Britt and Careem Conley from the back deck.

The Fourth Amendment's warrantless entry prohibition does not apply "to situations in which voluntary consent has been obtained, either from the individual whose property is searched . . . , or from a third party who possesses common authority over the premises . . . ." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citations omitted).  No constitutional violation arises "when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises."  *Id.* at 186.  Here, Plaintiffs argue that the facts regarding Byrd-Davis' consent are in dispute.  Specifically, Plaintiffs assert that her consent may have been coerced by an implicit threat of physical force, including baton strikes.  However, Plaintiffs have produced no evidence to support this contention.  Byrd-Davis testified that after the altercation, officers asked her if they could go through the house to escort Britt and Careem Conley to the street.  She told them that they could.  There is no evidence that Byrd-Davis was threatened or otherwise forced to let the officers into the house.  Accordingly, the court grants summary judgment on Byrd's unlawful entry claim to the extent that it is based upon the officers' entry into his home.

### 4.   Unlawful Entry Claim Based Upon the Officers' Going Upstairs in His Home

Defendants seek summary judgment on Byrd's unlawful entry claim to the extent that it is based upon officers following Rashad Conley upstairs after the altercation on the back deck.  At oral argument, Plaintiffs conceded this claim.  The court therefore grants summary judgment on Byrd's unlawful entry claim premised on the officers going upstairs in his home.

### 5.   Unlawful Entry Claim Against Pascua

United States District Court

For the Northern District of California

Defendants move for summary judgment on Byrd's unlawful entry claim against Pascua on the grounds that there is no evidence that Pascua entered Byrd's property.  Although it is not clear from their opposition brief, Plaintiffs appear to argue that Pascua is liable as an integral participant because he made false statements that set a series of events into motion, leading to the alleged violations.

As Defendants correctly point out, there is no evidence that Pascua ever entered Byrd's property.  Further, as with Britt's unlawful detention and excessive force claims against Pascua, there is no evidence that Pascua made any false statements.  Accordingly, the court grants summary judgment on Byrd's unlawful entry claim against Pascua.

### C.     Plaintiff Rashad Conley

#### 1.     Excessive Force Claim Against Catlett, Rodatos, and Soares

Defendants argue that the court should grant summary judgment on Rashad Conley's excessive force claim against Catlett because his use of force was reasonable in light of the circumstances.  Defendants also argue that there is no evidence that Rodatos and Soares used force on Rashad Conley.  Plaintiffs argue that these officers are liable because they were integral participants in the use of force on Rashad Conley.

Rashad Conley testified that while officers were trying to gain control of Careem Conley, he threw himself on top of Careem and was hit on his back with batons.  He testified that he "got a few [baton strikes] on his back," that he doesn't know how many times he was hit on his back, and that when he stood up, Catlett jabbed him twice in the ribs with his baton.  (R. Conley Dep. 67:4-68:18.)  Rashad was unable to identify any other officers who hit him.  He did not seek medical attention for any injury to his back.  (R. Conley Dep. 134:20-25.)

With respect to Soares and Rodatos, the court concludes that there is sufficient evidence to create a triable issue of material fact as to whether they were integral participants in the use of force on Rashad Conley.  As in *Rutherford*, Soares and Rodatos denied using force on Rashad Conley, but both officers were present on the back deck during the use of force on him.  In addition, both officers admit that they used force on Careem Conley.  (Rodatos Dep. 52, 55; PH Trans. 52-53, 59, 70-71.)  Given that Rashad Conley threw himself on top of Careem before Rashad was struck on his

United States District Court
For the Northern District of California

1    back with batons, a reasonable jury could conclude that the officers who admitted using force on

2    Careem also used force on Rashad Conley, even if he could not identify them by name.

3          With respect to whether the officers used reasonable force, the question is whether an

4    officer's actions were objectively reasonable in light of the facts and circumstances confronting him.

5    *See Graham*, 490 U.S. at 396. As part of this inquiry, the court must consider whether there was a

6    *need* for the use of the force that was employed; as the Ninth Circuit has noted, the need for the

7    force used is the essence of the *Graham* objective reasonableness analysis. *Liston*, 120 F.3d at 976

8    ("'The force which was applied must be balanced against the *need* for that force: it is the need for

9    force which is at the heart of the *Graham* factors.'" (emphasis in original) (quoting *Alexander v. City

10   & Cnty. of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994))). The court must also evaluate

11   "whether the suspect poses an immediate threat to the safety of the officers or others." *Smith*, 394

12   F.3d at 702.

13         Here, there are genuine disputes of material facts which preclude a determination that the

14   force used on Rashad Conley was reasonable in light of all of the circumstances. It is undisputed

15   that Rashad Conley did not comply with the officers' directions to go back inside the house but that

16   he instead inserted himself into the altercation between Careem and the officers. However, the

17   *nature* of the altercation is disputed. The officers testified that Careem punched Rodatos, but

18   Careem testified that the only resistance he offered was pulling his arm away from Rodatos after

19   Rodatos grabbed him. Britt testified that he saw Careem take the fetal position and cover his head

20   while officers were striking him with their batons. (C. Conley Dep. 50; 62:3-7; Decl. of Britt ¶ 6.)

21   Given the disputes of fact regarding what exactly happened on the deck during the altercation, it is

22   impossible for the court to evaluate whether there was a need to use force on Rashad and if so,

23   whether the force the officers used on him was reasonable. *See Avina*, 681 F.3d at 1130 (noting that

24   summary judgment in excessive force cases should be granted sparingly, as "the excessive force

25   inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw

26   inferences therefrom"). Accordingly, summary judgment on Rashad Conley's excessive force

27   claims against Catlett, Rodatos, and Soares is denied.

28         **2.**       **Excessive Force Claim Against Pascua**

United States District Court

For the Northern District of California

1    Defendants move for summary judgment on Rashad Conley's excessive force claim against

2  Pascua.  As with the other claims asserted by Plaintiffs against Pascua, there is no evidence that

3  Pascua played any role in this alleged constitutional violation.  There is no evidence that Pascua had

4  any interaction with Rashad Conley or made any false statements that set in motion the series of

5  events that led to the use of force against him.  Accordingly, summary judgment is granted on

6  Rashad Conley's excessive force claim against Pascua.

7        **3.      Unlawful Detention Claim Against Rodatos, Catlett and Soares**

8    Defendants next move for judgment on Rashad Conley's unlawful detention claim against

9  Rodatos, Catlett and Soares.  Plaintiffs did not contest this claim.  Accordingly, summary judgment

10  is granted.

11      **D.      Plaintiff Andrew Armstrong's Unlawful Detention Claim Against Escobar**

12    Plaintiff Armstrong's sole claim is for unlawful detention against Sergeant Escobar.

13  Defendants move for summary judgment on the ground that Escobar had reasonable suspicion to

14  detain Armstrong under the circumstances.  In the alternative, Defendants argue that Escobar is

15  entitled to qualified immunity.

16    The following facts are undisputed.  Escobar went to the target house to speak with West-

17  Walker, a suspect in a shooting, while the other officers took up perimeter positions.  After making

18  contact with a woman who answered the front door of the target house, Escobar learned over the

19  radio that officers were chasing someone in the backyards of the block, and that officers had

20  requested backup.  He subsequently learned that there was a struggle in progress behind the houses

21  in that block, and that someone was resisting.  He also knew that the yards behind the houses on

22  Bowdoin were connected.  During this activity, Escobar saw Armstrong leave the front entrance of

23  1305 Bowdoin, two doors north of the target house, moving at a slight jog.

24    The court concludes that Escobar's decision to detain Armstrong to determine his

25  involvement in the events occurring in the rear of the houses or with the shooting that had occurred

26  the previous day was supported by a reasonable, articulable suspicion.  In their opposition, Plaintiffs

27  point to the existence of disputed facts regarding Armstrong's alleged appearance and use of

28  profanities in conversation with Escobar.  However, Defendants did not rely on these facts to

United States District Court
For the Northern District of California

1    support their argument that reasonable suspicion supported Escobar's detention of Armstrong.  The

2    court finds that the undisputed facts about the police action in the area, the information Escobar

3    learned about the events taking place behind the houses, the focus on the target house at 1315

4    Bowdoin, and Armstrong's departure from 1305 Bowdoin at a slight jog, all support the

5    reasonableness of Escobar's decision to detain Armstrong.

6         At oral argument, Plaintiffs argued for the first time that Armstrong's detention was

7    unreasonable given its length, which was approximately one hour.[11]  A lawful seizure can become

8    unlawful "if it is prolonged beyond the time reasonably required to complete its mission."  *Illinois v.*

9    *Caballes*, 543 U.S. 405, 407 (2005).  Plaintiffs had the opportunity to develop facts regarding the

10   reasonableness of the length of Escobar's investigation into Armstrong's involvement.  However,

11   they have presented no evidence that the police officers detaining Armstrong unnecessarily delayed

12   or otherwise prolonged his detention by engaging in activities unrelated to resolving the question of

13   his involvement in an expedited manner.  *See United States v. Torres-Sanchez*, 83 F.3d 1123, 1128-

14   29 (9th Cir. 1996) (discussing the Supreme Court's refusal to set definitive time limit of lawful

15   investigative stop, holding that "[t]he critical inquiry is whether the officers 'diligently pursued a

16   means of investigation that was likely to confirm or dispel their suspicions quickly, during which

17   time it was necessary to detain the defendant.'" (citing *Sharpe*, 470 U.S. at 686)).  During the hour-

18   long detention of Armstrong, Escobar, as one of the supervisors on the scene, sorted out what had

19   happened in the backyards by speaking to officers with knowledge of the events in the backyards.

20   (Escobar Dep. 73:9-74:11.)  The court concludes that Plaintiffs have not established that there is a

21   dispute of material fact regarding the reasonableness of the investigation undertaken by the officers

22   to determine whether Armstrong was involved in criminal activity following his initial detention.

23   Accordingly, summary judgment on Armstrong's claim is appropriate.[12]

24

25        [11] Plaintiffs did not argue that the length of Armstrong's detention ripened it into an arrest, thus
     requiring probable cause.  *See United States v. Torres-Sanchez*, 83 F.3d 1123, 1127-28 (9th Cir. 1996).

26        [12] Because the court concludes that Defendants are entitled to summary judgment on the merits
27   of Armstrong's unlawful detention claim against Escobar, it need not reach the issue of qualified
     immunity.  *See Saucier*, 533 U.S. at 201 (holding that "[i]f no constitutional right would have been
     violated were the allegations established, there is no necessity for further inquiries concerning qualified
28   immunity.").

**E.     Plaintiffs' Remaining Claims**

Finally, Defendants move for summary judgment on Plaintiffs' *Monell* claim against the City and County of San Francisco, as well as on Plaintiffs' equal protection claim against Defendants. Plaintiffs did not oppose Defendants' motion as to these claims.  Accordingly, the court grants summary judgment on Plaintiffs' *Monell* claim and equal protection claim.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  Summary judgment is GRANTED as to all claims against Defendants Pascua, Escobar, and the City and County of San Francisco.  Summary judgment is also GRANTED as to Rashad Conley's unlawful detention claims against Defendants Rodatos, Catlett and Soares and Byrd's unlawful entry claims based upon the officers' entry into his home and going upstairs in his home.  Summary judgment is DENIED as to the following claims:

- Britt's unlawful detention claims against Defendants Sanders and Rodatos;
- Britt's unlawful detention claims against Defendants Catlett and Soares;
- Britt's excessive force claims against Defendants Sanders and Rodatos based upon their display of firearms;
- Britt's excessive force claim against Defendant Catlett;
- Byrd's unlawful entry claims against Defendants Rodatos, Soares, and Catlett based upon their entry into his backyard and onto his deck; and
- Rashad Conley's excessive force claims against Catlett, Soares, and Rodatos.

IT IS SO ORDERED.

Dated: February 5, 2013



_____
DONNA M. RYU
United States Magistrate Judge